David Makman, SBN 178195
LAW OFFICES OF DAVID A. MAKMAN
483 Seaport Ct, Ste 103
Redwood City, CA 94063
Telephone: (650) 520-5583
david@makmanlaw.com

Adrienne Yoseph, *Pro Hac Vice Motion Forthcoming*
BUZKO KRASNOV
228 Park Avenue South
PMB 85451
New York, New York 10003
Telephone: (718) 557-9582
adrienne.yoseph@buzko.legal

Robert Lynch, *Pro Hac Vice Motion Forthcoming*
BUZKO KRASNOV
228 Park Avenue South
PMB 85451
New York, New York 10003
Telephone:  (202) 509-1621
robert.lynch@buzko.legal

*Attorneys for Plaintiff, Ex-Human Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **Ex-Human Inc., a Delaware corporation,** | **Case No. 26-2798** |
| **Plaintiff,** | |
| **v.** | |
| **Apple Inc., a California corporation,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

**NATURE OF ACTION**

1.      This action arises from Apple Inc.'s ("Apple") termination of Plaintiff Ex-Human Inc.'s ("Ex-Human") developer account and its concurrent decision to withhold substantial earned revenue, following allegations of "dishonest or fraudulent activity" that Apple has never explained with any specificity. Ex-Human seeks injunctive relief to restore access to the iOS platform and to

1

**COMPLAINT**

recover approximately $500,000 in revenue generated through completed transactions but currently withheld by Apple.

2.     Ex-Human develops consumer-facing artificial intelligence applications. Its products, Botify AI ("Botify") and Photify AI ("Photify"), have attracted large and engaged user bases through Apple's App Store. Botify, launched in August 2021, has generated more than 2.3 million iOS installs and approximately $330,000 in monthly revenue. Photify, launched in February 2024, generates approximately $100,000 in monthly revenue.

3.     On January 24, 2026, Apple issued a "Pending Termination Notice," asserting that Ex-Human's developer account had been used for "dishonest or fraudulent activity" in violation of Section 3.2(f) of the Apple Developer Program License Agreement ("DPLA"). Apple simultaneously froze all earnings associated with Botify and Photify. Ex-Human submitted multiple appeals and a reinstatement petition. In response, Apple repeatedly cited Section 3.2(f) but did not identify any specific act, transaction, or submission that purportedly violated that provision. Apple terminated Ex-Human's developer account on March 13, 2026.

4.     Throughout the appeals process, Ex-Human provided detailed information regarding its applications, including their technical architecture and moderation systems. Apple's responses remained generalized and non-specific, referring to categories of potential misconduct without identifying the conduct at issue. Despite having access to transaction-level data and platform activity, Apple did not identify any particular transactions, user activity, or application behavior that formed the basis of its determination.

5.     Ex-Human also attempted to engage Apple through additional channels, including Apple's App Store Business Management team, which had previously identified Ex-Human as a high-growth developer. Requests for direct communication with Apple's App Review team were denied.

**COMPLAINT**

6.    As a result of Apple's actions, Ex-Human has been removed from the iOS platform, cutting off its ability to distribute its applications, maintain user relationships, and continue ongoing subscription-based services. These harms are ongoing and cannot be fully remedied through monetary damages alone.

7.    Apple has also continued to withhold approximately $500,000 in revenue generated through completed transactions on Botify and Photify. Apple has not identified any specific transactions as fraudulent, subject to chargeback, or otherwise ineligible for payment, nor has it provided any accounting explaining the basis for withholding these funds.

8.    Photify operates in a category of applications that overlaps in functionality with Apple's own Image Playground offering, including user-generated image creation from selfies, style transformation, and avatar-based features. Apple removed Photify from the App Store while continuing to offer its own competing product on the same platform. In the absence of any identified violation by Ex-Human, this context underscores the opacity of Apple's decision-making process and the absence of any articulated basis for its actions.

9.    Ex-Human brings this action for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, unjust enrichment, and violations of California's Unfair Competition Law. Ex-Human seeks injunctive relief restoring its Apple Developer Program membership, restoring Botify and Photify to availability on the App Store, and requiring Apple to release withheld developer proceeds, as well as such other relief as the Court deems appropriate.

## **PARTIES**

10.    Plaintiff Ex-Human is a Delaware corporation, with its principal place of business in Boulder, Colorado.

11.    Defendant Apple is a California corporation formed and doing business under the laws of the state of California, with its principal place of business in Cupertino, California.

3

**COMPLAINT**

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees, and because there is complete diversity between the parties, as this is an action between citizens of different states. Plaintiff Ex-Human is a citizen of Delaware and Colorado, and Defendant Apple is a citizen of California.

13.     Apple is subject to personal jurisdiction in this Court pursuant to California Code of Civil Procedure Section 410.10 because Apple is a citizen of or domiciled in California, operates from its principal place of business in California, maintains substantial or continuous and systemic contacts with California, has purposefully availed itself of the economic benefits of transacting business in California, and has committed the tortious acts alleged in this Complaint in California.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Apple is located in this District and a substantial part of the events or omissions giving rise to Ex-Human's claims occurred in this District.

15.     For the same reasons mentioned in the paragraphs above, the Divisional Assignment is also proper pursuant to Local Rule 3-5(b).

**FACTS**

**I.      Apple's App Store and Developer Program**

16.     Apple designs, manufactures, and sells iPhones, which operate on Apple's proprietary mobile operating system, iOS.

17.     A mobile operating system ("OS") is software that enables a smartphone's core functions and allows users to run applications ("apps") on the device. Applications must be developed for iOS in order to function on an iPhone.

18.     iPhone users rely on both Apple-developed and third-party applications to fully enjoy the capabilities of their devices.

4

**COMPLAINT**

19.     Third-party developers, including Plaintiff Ex-Human, distribute iOS applications to iPhone users through Apple's App Store. Apple owns and operates the App Store and administers the processes through which applications are submitted, reviewed, and made available to iOS users.

**II.     The Apple Developer Program License Agreement**

20.     Apple operates the App Store as the primary distribution channel for native iOS applications on iPhone. Apple controls access to that distribution channel through its developer program and app review processes, which are governed by the Apple Developer Program License Agreement (the "DPLA").

21.     Apple drafts and imposes the DPLA as a condition of participation in the Apple Developer Program. Third-party developers, including Ex-Human, must assent to the DPLA in order to access Apple's development tools, submit applications for review, and distribute applications through the App Store. The DPLA grants developers a limited, non-exclusive license to use Apple's software, services, and distribution platform, subject to compliance with Apple's policies, App Review Guidelines, and related program requirements.

22.     To make an iOS application available on the App Store, a developer must submit the application to Apple for review. Apple evaluates submitted applications through its review process and determines whether an application satisfies the DPLA and App Review Guidelines. Only applications that Apple approves may be distributed through the App Store.

23.     The DPLA provides Apple with broad authority over the continued availability of applications and developer accounts. Among other provisions, Apple reserves the right to suspend, remove, or disable access to applications or developer accounts and to limit or revoke access to Apple services in its discretion, including in circumstances where Apple believes that a developer has violated applicable requirements.

24.     The parties' relationship with respect to paid applications and in-app purchases is

**COMPLAINT**

governed by Schedule 2 to the DPLA, which Ex-Human entered into in order to distribute paid content and process App Store transactions. Under Schedule 2, Apple acts as the developer's agent and commissionaire for purposes of collecting and remitting payments from end users. Apple collects payments on behalf of the developer and is responsible for processing those transactions through its payment infrastructure.

25. Section 2.8 of the DPLA provides that Apple "reserves the right to change, suspend, deprecate, deny, limit, or disable access to the Apple Services, or any part thereof, at any time without notice," and that Apple "may revoke [a developer's] access to the Apple Services, or may cancel the Apple Services (or any part thereof) at any time without notice or liability … in its sole discretion."

26. Section 3.2(f) of the DPLA provides that developers may not engage in conduct that is unlawful, misleading, fraudulent, improper, or dishonest in connection with their applications or the App Store, including conduct that interferes with Apple's services or business practices. Apple relied on Section 3.2(f) as the stated basis for its actions against Ex-Human.

27. Although the DPLA provides Apple with discretion in administering its platform and enforcing its policies, Schedule 2 separately governs Apple's role in collecting and remitting developer proceeds. Schedule 2 Section 7.1 permits Apple, upon termination, to withhold payments for a period reasonably necessary to calculate and offset End-User refunds, and also permits withholding where Apple determines or suspects that a developer has engaged in suspicious, misleading, fraudulent, improper, unlawful, or dishonest conduct.

28. Schedule 2 does not provide that Apple may indefinitely retain all developer proceeds from completed transactions without identifying any corresponding refunds, offsets, or transaction-specific basis for withholding. Nor does it describe a mechanism by which Apple may permanently retain earned developer revenue without accounting for how those funds are applied.

**COMPLAINT**

29.    Ex-Human entered into the DPLA and Schedule 2 in order to develop and distribute its applications through the App Store and to process end-user transactions through Apple's payment system. In reliance on that relationship, Ex-Human built, operated, and maintained its applications on Apple's platform and routed all iOS transactions for Botify and Photify through Apple's payment infrastructure.

**III.    Ex-Human Inc.**

30.    Ex-Human is a technology company that develops consumer-facing artificial intelligence applications. It was founded by Artem Rodichev, who previously served as Head of AI at Replika, an AI companion platform used by millions of users worldwide.

31.    Ex-Human created its Apple Developer Program account on April 26, 2021. Through this account, Ex-Human has distributed two applications on the App Store: Botify and Photify.

32.    Ex-Human distributes these applications and provides ongoing updates and services to users through Apple's App Store. Ex-Human's ability to reach iOS users, maintain existing subscriptions, and operate these applications depends on continued access to the App Store and Ex-Human's Apple Developer Program membership.

33.    Botify is an AI companion application that enables users to create and interact with AI-powered personas through natural conversation. Botify relies on Ex-Human's application and model-serving infrastructure to deliver these features to end users.

34.    Botify had been continuously available on the App Store since August 30, 2021, nearly four years at the time of the events giving rise to this action. Botify has accumulated more than 2.3 million iOS installs and generates approximately $330,000 in monthly revenue.

35.    Photify is an AI image-generation application that enables users to generate and modify images and short-form video content using generative AI based on user-provided inputs,

including text prompts and, in certain workflows, user-provided photos. Photify was launched on the App Store on February 23, 2024 and generates approximately $100,000 in monthly revenue.

36. Both Botify and Photify are also available on the Google Play Store, where they have remained continuously available and subject to Google's independent review and compliance processes. Google has taken no adverse action against either application, and both continue to operate on Google Play without restriction.

**IV. Apple's Image Playground: A Direct Competitor to Photify AI**

37. Image Playground is an AI image-generation application developed, owned, and distributed by Apple. Apple makes Image Playground available to iOS users through its platform.

38. Photify and Image Playground operate in the same category of consumer-facing AI image-generation applications and share overlapping functionality and user experience. Both applications enable users to generate images from user-provided inputs, including selfies; allow users to select among multiple faces or personas; offer a range of visual styles; and include user-facing features for modifying appearance, such as virtual clothing or accessory transformations.

39. Side-by-side comparisons of Photify and Image Playground reflect substantial overlap in core user-facing functionality, including selfie-based image generation, multi-face selection, visual-style selection, and appearance modification features. Representative screenshots illustrating these similarities are shown below.

8

**COMPLAINT**

*Both applications reflect substantial overlap in core user-facing functionality, including the generation of stylized images from a user-submitted selfie*



*Both applications allow users to select among multiple faces or persons as inputs for image generation*



**COMPLAINT**

*Both applications allow users to select among multiple visual styles for image generation*



*Both applications include user-facing features for virtual clothing or accessory transformation*



**COMPLAINT**

40.    Apple removed Photify from the App Store while continuing to offer Image Playground on the same platform. As a result, Photify is no longer available to iOS users, while Image Playground remains accessible through Apple's distribution channel.

41.    Apple occupies a dual role within the iOS ecosystem relevant to this action. Apple both controls access to iOS application distribution through the App Store and offers its own applications within the same categories as third-party developers. In light of the substantial overlap between Photify and Image Playground, and the absence of any identified specific violation by Ex-Human, this context underscores the opacity of Apple's decision-making process and supports Ex-Human's request for discovery into the basis for Apple's actions.

## V.    Apple's Termination Notice and Ex-Human's Appeals

42.    On January 24, 2026, Apple sent Ex-Human a Pending Termination Notice through Photify's App Store Connect messages, citing DPLA Section 3.2(f) and asserting that Ex-Human's developer account "has been used for dishonest or fraudulent activity." Apple simultaneously paused all earnings payments to Ex-Human and removed Photify from the App Store, while Botify remained available. The notice further stated that "[a]pp submissions from your account have repeatedly violated the App Review Guidelines in an attempt to evade the review process" and that, "after multiple resubmissions, the guideline violation(s) detailed to you in prior correspondence remain unresolved."

43.    Apple's January 24 notice did not identify the specific submission, transaction, act, or guideline violation on which its determination was based. Nor did it identify the "prior correspondence" to which it referred or explain what conduct Apple contended remained unresolved.

44.    On January 25, 2026, Rodichev submitted an appeal on Ex-Human's behalf to the App Review Board. The appeal provided Apple with a detailed explanation of Ex-Human's

**COMPLAINT**

technical architecture and content-moderation systems and offered to implement any additional measures Apple required.

45.    On February 10, 2026, Apple denied the appeal. Apple stated that "the improvements you described in your appeal are insufficient to resolve the issues we previously identified" and that it had found a "pattern of manipulative or misleading behavior." Apple then listed a non-exhaustive set of possible violations, including inaccurate metadata, misleading app content, inauthentic ratings manipulation, misleading customer support responses, and bait-and-switch purchasing practices. Apple did not state which, if any, of those categories it attributed to Ex-Human, and it did not identify any specific submission, transaction, or act.

46.    On February 11, 2026, Rodichev submitted a reinstatement petition on Ex-Human's behalf. The petition emphasized that Botify had remained continuously available on the App Store for nearly four years and had served more than one million iOS users, and that termination of Ex-Human's developer account would remove Botify even though Apple's first three termination-related communications had been directed to Photify.

47.    On February 20, 2026, Apple denied the reinstatement petition. The denial was substantively identical to Apple's February 10 response: it again quoted Section 3.2(f), again referred generally to "manipulative or misleading behavior," and again listed categories of possible misconduct without identifying the conduct Apple contended Ex-Human had engaged in. Apple did not address Ex-Human's arguments regarding Botify or identify any specific submission, transaction, or act.

48.    On February 23, 2026, Apple sent a further communication that, for the first time, identified specific App Review Guidelines: Guideline 1.1, Guideline 1.1.4, and Guideline 5.6. Apple stated that both Photify and Botify had been "rejected multiple times" for violations of those guidelines and characterized the violations as "egregious and repeated." Even then, Apple did not

identify the particular submissions, content, transactions, or acts underlying those characterizations.

49. On February 25, 2026, Rodichev submitted a third appeal on Ex-Human's behalf. In that appeal, Ex-Human narrowed its request and stated that it was not contesting Photify's removal. Ex-Human requested only that its Apple Developer Program membership be reinstated so that Botify could remain available to its iOS user base.

50. On February 27, 2026, Apple denied Ex-Human's third appeal. Apple's response repeated the same Section 3.2(f) language, the same cited App Review Guidelines, and the same generalized characterizations of "manipulative or misleading behavior" and "egregious and repeated" violations. Apple again did not identify any specific submission, transaction, or act, did not address Ex-Human's narrowed request as to Botify, and did not identify any contractual basis for retaining Ex-Human's withheld funds.

51. Separately, on February 26, 2026, Apple's App Store Business Management team contacted Ex-Human and identified it as part of a select group of developers with notable growth on the App Store. During a March 4, 2026 call, Rodichev raised the pending termination. Apple's representative responded only that the App Review team "operates independently from Business Management" and that he could not influence review decisions.

52. On March 6, 2026, Rodichev submitted a fourth appeal on Ex-Human's behalf. In that appeal, Ex-Human stated that it had implemented additional safeguards to strengthen moderation, safety, and compliance across its apps. Ex-Human also explained that Botify AI serves a large global user base and that termination of its developer account would disrupt access for many users. Ex-Human reiterated its willingness to work with Apple.

53. Apple's Business Management team also provided a link through which Rodichev attempted to schedule a call directly with the App Review team. Rodichev made four separate attempts to do so, but each request was rejected. On March 10, 2026, Apple issued another denial

that again cited Section 3.2(f) and the same App Review Guidelines, while still identifying no specific submission, transaction, or act.

54.    On March 13, 2026, Apple formally terminated Ex-Human's Apple Developer Program membership. The termination notice repeated the same Section 3.2(f)-based rationale without identifying any new or specific factual basis. As an immediate consequence of the termination, Botify was removed from the App Store, iOS in-app payment processing ceased, and Ex-Human lost access to Botify's iOS user base.

## VI.    Ex-Human's Withheld Revenue

55.    Apple paused all earnings payments to Ex-Human effective January 24, 2026. As of the filing of this Complaint, Apple has withheld approximately $500,000 in developer revenue associated with completed App Store transactions across Botify and Photify.

56.    These funds were generated through end-user purchases processed through Apple's in-app payment system and collected by Apple in its role as Ex-Human's agent and commissionaire under Schedule 2 of the DPLA.

57.    Apple has access to transaction-level data for Botify and Photify, including information sufficient to identify refunds, chargebacks, disputed transactions, and other transaction-specific adjustments. Apple has not identified any specific transaction that it contends is fraudulent, invalid, subject to chargeback, or otherwise ineligible for payment.

58.    Apple has not provided Ex-Human with any accounting of the withheld funds, including any breakdown identifying what portion of the withheld revenue, if any, corresponds to refunds, offsets, or other transaction-specific adjustments.

59.    Based on Ex-Human's historical data, Botify's refund rate is approximately 1.5% and Photify's refund rate is approximately 1.0%. Apple has long had access to the data necessary to calculate any refund-related offsets or other payment adjustments. Any such offsets would

**COMPLAINT**

represent only a fraction of the approximately $500,000 currently withheld.

60.    Schedule 2 Section 7.1 permits Apple, upon termination, to withhold payments for a period reasonably necessary to calculate and offset End-User refunds and also permits withholding where Apple determines or suspects that a developer has engaged in suspicious, misleading, fraudulent, improper, unlawful, or dishonest conduct. Apple has not identified any specific transactions, refunds, or conduct to which the withheld funds are tied, nor has it represented that the withheld funds have been applied to any such purpose.

61.    Apple has not explained the basis on which it continues to retain 100% of Ex-Human's earned revenue from completed transactions. Apple's ongoing retention of those funds, without any identified transaction-level basis or accounting, is not tied to any disclosed refund obligation, offset, or other specific adjustment under the governing agreements.

62.    Under Schedule 2, Apple collects end-user payments on behalf of developers and is responsible for remitting those proceeds, subject to applicable offsets. Apple's continued retention of Ex-Human's funds without providing any accounting or identified basis for withholding is inconsistent with its role in collecting and remitting those proceeds.

## VII.    Harm to Ex-Human

63.    Apple's removal of Photify from the App Store has caused and continues to cause substantial harm to Ex-Human. Before its removal, Photify generated approximately $100,000 in monthly revenue through the App Store. Its removal eliminated Ex-Human's ability to distribute Photify to iOS users, continue serving existing iOS users through the App Store, and maintain the application's presence on the iOS platform.

64.    Botify was removed from the App Store on March 13, 2026, upon the formal termination of Ex-Human's developer account. Botify's removal severed Ex-Human's access to its iOS user base, disrupted Ex-Human's ongoing subscription-based relationship with those users,

15
**COMPLAINT**

and eliminated Botify's primary revenue stream of approximately $330,000 per month. iOS in-app payment processing for Botify ceased upon termination.

65. Apple's continued withholding of approximately $500,000 in earned revenue causes ongoing harm to Ex-Human independent of the application removals. Those withheld funds are revenue generated through completed App Store transactions and are funds Ex-Human would otherwise use to operate, maintain, and support its applications and business.

66. The harm caused by Apple's conduct cannot be fully remedied through monetary damages alone. In the United States, the App Store is the only authorized distribution channel for native iOS applications. Without access to the App Store and Ex-Human's developer account, Ex-Human cannot distribute its applications to iOS users, restore service through that channel, or maintain its ongoing relationships with its iOS user base. Each day that Ex-Human remains excluded from the App Store further disrupts its relationships with existing users, leads to user attrition and loss of engagement, and diminishes the likelihood that those users will return even if access is later restored. This ongoing loss of user relationships, goodwill, and market presence is not readily quantifiable and cannot be fully remedied through an award of damages.

## COUNT I
### Breach of Contract

67. Ex-Human realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68. Ex-Human and Apple entered into valid and enforceable agreements governing Ex-Human's participation in the Apple Developer Program and Apple's collection and remittance of end-user payments, including the DPLA and Schedule 2. Ex-Human performed its obligations under those agreements, including distributing its applications through Apple's platform and remitting Apple's contractual share of App Store revenue.

69. Schedule 2 governs Apple's role as Ex-Human's agent and commissionaire for

16
**COMPLAINT**

purposes of collecting and remitting proceeds from paid applications and in-app purchases. Under Schedule 2, Apple collects end-user payments on Ex-Human's behalf and is responsible for remitting those proceeds to Ex-Human, subject to any applicable offsets or withholding authorized by the parties' agreements.

70.     Apple withheld Ex-Human's accrued developer proceeds effective January 24, 2026 and, as of the filing of this Complaint, continues to withhold approximately $500,000 associated with completed App Store transactions across Botify and Photify.

71.     Apple has not identified any specific transaction that it contends is fraudulent, invalid, subject to chargeback, or otherwise ineligible for payment, and has not provided any accounting identifying what portion of the withheld funds, if any, corresponds to refunds, offsets, or other transaction-specific adjustments.

72.     Schedule 2 Section 7.1 permits Apple, upon termination, to withhold payments for a period reasonably necessary to calculate and offset End-User refunds and also permits withholding where Apple determines or suspects that a developer has engaged in suspicious, misleading, fraudulent, improper, unlawful, or dishonest conduct. Apple has not identified any transaction, refund obligation, offset, or other payment-related basis to which the withheld funds are tied, nor has it represented that the withheld funds have been applied to any such purpose.

73.     By continuing to retain Ex-Human's accrued proceeds without identifying any transaction-specific basis for withholding, without providing any accounting of the withheld funds, and without remitting proceeds from completed transactions as required under Schedule 2, Apple has breached its contractual obligations to Ex-Human.

74.     As a direct and proximate result of Apple's breach, Ex-Human has suffered damages in an amount to be proven at trial, including at least the approximately $500,000 in withheld developer proceeds, plus any additional amounts wrongfully withheld.

**COUNT II**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
*Withheld Proceeds*

75.    Ex-Human realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

76.    The DPLA and Schedule 2 impose on each party a duty of good faith and fair dealing in the performance and enforcement of the parties' agreements.

77.    Schedule 2 grants Apple discretion with respect to the collection, withholding, and remittance of developer proceeds. That discretion, if exercised, must be exercised in good faith and in a manner consistent with the purposes of the parties' agreements.

78.    Apple exercised that discretion by freezing all earnings payments to Ex-Human effective January 24, 2026 and continuing to retain approximately $500,000 in accrued developer proceeds associated with completed App Store transactions across Botify and Photify.

79.    Apple has not identified any specific transaction that it contends is fraudulent, invalid, subject to chargeback, or otherwise ineligible for payment, and has not provided any accounting identifying what portion of the withheld funds, if any, corresponds to refunds, offsets, or other transaction-specific adjustments.

80.    Apple has also not represented that the withheld funds have been applied to any identified refund obligation, offset, or other payment-related purpose authorized by Schedule 2 Section 7.1.

81.    By continuing to retain Ex-Human's accrued proceeds without identifying any transaction-specific basis for withholding, without providing any accounting of the withheld funds, and without remitting proceeds from completed transactions within the scope and purpose of Schedule 2, Apple has exercised its contractual discretion in a manner that unfairly frustrates Ex-Human's right to receive the benefits of the parties' agreements.

82.    As a direct and proximate result of Apple's breach of the implied covenant of good

18
**COMPLAINT**

faith and fair dealing, Ex-Human has suffered damages in an amount to be proven at trial, including at least the approximately $500,000 in withheld developer proceeds, plus any additional amounts wrongfully withheld.

<u>**COUNT III**</u>
**Breach of Implied Covenant of Good Faith and Fair Dealing**
*Termination and Continued Exclusion*

83.     Ex-Human realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

84.     The DPLA governs Apple's administration of Ex-Human's participation in the Apple Developer Program, including Apple's review, enforcement, and termination-related decisions. The DPLA imposes on each party a duty of good faith and fair dealing in the performance and enforcement of the parties' agreements.

85.     Apple invoked DPLA Section 3.2(f) and later cited App Review Guidelines 1.1, 1.1.4, and 5.6 as the stated basis for terminating Ex-Human's developer account and removing Botify and Photify from the App Store.

86.     After invoking those misconduct-based provisions, Apple repeatedly refused to identify the specific conduct, submissions, transactions, content, or other factual basis that it contended violated Section 3.2(f) or the cited Guidelines. Apple instead relied on generalized and non-exhaustive descriptions of possible misconduct while continuing to enforce the termination and exclusion of Ex-Human and its applications.

87.     Ex-Human, through Rodichev, repeatedly attempted in good faith to respond to Apple's stated concerns, including by providing explanations regarding Ex-Human's technical architecture and moderation systems, submitting multiple appeals, and narrowing its request to seek reinstatement of its Apple Developer Program membership so that Botify could remain available to iOS users. Apple nevertheless continued to enforce the termination without identifying the factual basis for its misconduct determination.

19
**COMPLAINT**

88.     By invoking misconduct-based provisions as the basis for termination and continued exclusion, while refusing to identify the conduct Apple contended triggered those provisions and denying Ex-Human any meaningful opportunity to respond to the stated basis for its decision, Apple exercised its contractual enforcement discretion in a manner that unfairly frustrated Ex-Human's rights under the parties' agreements, including Ex-Human's ability to continue distributing Botify and Photify through the App Store.

89.     The overlap between Photify and Apple's Image Playground provides further context supporting the inference that Apple's exercise of its enforcement discretion was not undertaken in good faith.

90.     As a direct and proximate result of Apple's breach of the implied covenant of good faith and fair dealing, Ex-Human has suffered damages and ongoing harm in an amount to be proven at trial, including loss of platform access, loss of user relationships, loss of goodwill, and loss of revenue associated with the removal of Botify and Photify from the App Store.

**COUNT IV**
**Declaratory Relief**

91.     Ex-Human realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

92.     An actual and justiciable controversy exists between Ex-Human and Apple concerning Apple's asserted authority under the DPLA and Schedule 2 to: (a) terminate Ex-Human's Apple Developer Program membership and continue excluding Botify and Photify from the App Store based on Apple's stated reliance on DPLA Section 3.2(f) and the App Review Guidelines Apple cited in its communications; and (b) withhold and retain Ex-Human's accrued developer proceeds.

93.     Apple contends, by its notices, appeal denials, termination decision, and ongoing conduct, that it is entitled to continue enforcing the termination of Ex-Human's developer account,

20
**COMPLAINT**

the removal of Botify and Photify from the App Store, the cessation of iOS payment processing for those applications, and the withholding of approximately $500,000 in developer proceeds associated with completed App Store transactions.

94.    Ex-Human contends that Apple may not continue to enforce the termination and exclusion of Ex-Human and its applications on the basis asserted in Apple's communications without identifying the specific conduct, submissions, transactions, content, or other factual basis that Apple contends violated Section 3.2(f) or the cited App Review Guidelines. Ex-Human further contends that Apple may not continue withholding developer proceeds without identifying any specific transaction, refund obligation, offset, or other payment-related basis for doing so.

95.    Ex-Human therefore seeks a declaration regarding the parties' respective rights and obligations under the DPLA and Schedule 2, including: (a) whether Apple may continue to terminate and exclude Ex-Human and its applications from the App Store based on the stated Section 3.2(f) and guideline rationale without identifying the conduct Apple contends triggered those provisions; (b) whether Apple may continue withholding Ex-Human's accrued developer proceeds without identifying any specific transaction, refund, offset, or other payment-related basis for doing so; and (c) whether Apple is required to provide an accounting identifying the basis for any continued withholding of developer proceeds.

96.    A judicial declaration is necessary and appropriate at this time in order to resolve the parties' dispute, determine Ex-Human's entitlement to restoration of its developer account, restoration of Botify and Photify to the App Store, resumption of iOS payment processing, and release of withheld developer proceeds, and prevent the accrual of further harm from Apple's ongoing exclusion of Ex-Human and retention of its funds.

## COUNT V
### Unjust Enrichment

97.    Ex-Human re-alleges and incorporates by reference all preceding paragraphs as

**COMPLAINT**

though fully set forth herein.

98.     Apple has been unjustly enriched at Ex-Human's expense by retaining approximately $500,000 in earned developer revenue from completed App Store transactions without legal entitlement to those funds. Apple received this revenue in the form of developer proceeds that it is obligated to remit to Ex-Human under the terms of the DPLA and by operation of law.

99.     Apple has retained these funds without identifying any fraudulent transaction, chargeback, refund obligation, or indemnification claim that would provide a contractual or equitable basis for retaining them. No specific transaction underlying the withheld revenue has been identified by Apple as invalid or fraudulent.

100.     Apple's retention of the withheld revenue is unjust. It would be inequitable to permit Apple to retain indefinitely proceeds from completed commercial transactions to which Ex-Human has a vested right of receipt, under circumstances in which Apple has identified no basis for retention.

101.     Ex-Human is entitled to restitution of the withheld revenue in an amount to be determined at trial, together with prejudgment interest at the maximum legal rate, and to the imposition of a constructive trust over the withheld funds pending their return.

**COUNT VI**
**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
**(Unfair Prong)**

102.     Ex-Human realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

103.     California Business and Professions Code section 17200 prohibits unfair competition, including any unfair business act or practice.

104.     Apple's conduct is unfair within the meaning of section 17200 because Apple has

22
**COMPLAINT**

continued to withhold approximately $500,000 in accrued developer proceeds associated with completed App Store transactions, while failing to identify any specific transaction, refund obligation, offset, or other payment-related basis for doing so and failing to provide any accounting of the withheld funds.

105.    Apple's conduct is also unfair because Apple has continued to enforce the termination of Ex-Human's Apple Developer Program membership and the exclusion of Botify and Photify from the App Store based on Apple's stated reliance on Section 3.2(f) and cited App Review Guidelines, while failing to identify the specific conduct, submissions, transactions, content, or other factual basis that Apple contends triggered those provisions.

106.    Photify directly competes with Apple's Image Playground. As alleged, both applications operate in the same category of consumer-facing AI image-generation tools and share overlapping core functionality, including generating images from user-provided inputs, offering multiple visual styles, and enabling user-directed modification of appearance. Apple removed Photify from the App Store while continuing to offer its own competing application on the same platform, while at the same time failing to identify the factual basis for its misconduct determination. In these circumstances, Apple's continued exclusion of a competing application without identifying the conduct it contends justified that action is unfair within the meaning of Section 17200.

107.    Apple's conduct has caused substantial injury to Ex-Human, including the loss of money and property in the form of withheld developer proceeds, loss of App Store distribution, loss of user relationships, loss of goodwill, and loss of revenue associated with the removal of Botify and Photify from the App Store.

108.    Ex-Human has suffered injury in fact and has lost money or property as a result of Apple's unfair conduct.

109.    Ex-Human seeks restitution, injunctive relief, and such other equitable relief as the Court deems appropriate.

**REQUEST FOR RELIEF**

Plaintiff Ex-Human Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Apple Inc., and grant the following relief:

(a)    For injunctive relief, including a temporary restraining order, preliminary injunction, and permanent injunction, requiring Apple to restore Ex-Human's Apple Developer Program membership and restore Botify and Photify to availability on the App Store;

(b)    For injunctive relief, including a temporary restraining order, preliminary injunction, and permanent injunction, requiring Apple to resume ordinary iOS in-app payment processing and related App Store functionality for Botify and Photify;

(c)    For injunctive relief, including a temporary restraining order, preliminary injunction, and permanent injunction, requiring Apple to release to Ex-Human all developer proceeds wrongfully withheld, including the approximately $500,000 in accrued proceeds associated with completed App Store transactions, plus any additional amounts wrongfully withheld;

(d)    For a declaration that Apple may not continue to terminate and exclude Ex-Human and its applications from the App Store based on the stated Section 3.2(f) and App Review Guideline rationale without identifying the conduct Apple contends triggered those provisions;

(e)    For a declaration that Apple may not continue withholding Ex-Human's accrued developer proceeds without identifying any specific transaction, refund obligation, offset, or other payment-related basis for doing so;

(f)    For a declaration that Apple is required to provide an accounting identifying the basis for any continued withholding of developer proceeds;

**COMPLAINT**

(g)     For compensatory damages in an amount to be proven at trial, plus pre-judgment and post-judgment interest as permitted by law;

(h)     For restitution and other equitable monetary relief in an amount to be determined at trial, including all amounts wrongfully retained by Apple;

(i)     For attorneys' fees, expenses, and costs of suit as permitted by law; and

(j)     For such other and further relief as the Court deems just and proper.

Dated: March 31, 2026                          Respectfully submitted,

                                               LAW OFFICES OF DAVID A. MAKMAN


                                               By: /s/ David Alan Makman
                                                   David Makman, SBN 178195

                                               Counsel for Plaintiff
                                               Ex-Human Inc.

**COMPLAINT**

**JURY DEMAND**

Pursant to the Seventh Amendment and Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury.


Dated: March 31, 2026                    Respectfully submitted,

                                         LAW OFFICES OF DAVID A. MAKMAN


                                         By: /s/ *David Alan Makman*
                                               David Makman, SBN 178195

                                         Counsel for Plaintiff
                                         Ex-Human Inc.

**COMPLAINT**