David Makman, SBN 178195
LAW OFFICES OF DAVID A. MAKMAN
483 Seaport Ct, Ste 103
Redwood City, CA 94063
Telephone: (650) 520-5583
david@makmanlaw.com

Adrienne Yoseph, *Pro Hac Vice Motion Forthcoming*
BUZKO KRASNOV
228 Park Avenue South
PMB 85451
New York, New York 10003
Telephone: (718) 557-9582
adrienne.yoseph@buzko.legal

Robert Lynch, *Pro Hac Vice Motion Forthcoming*
BUZKO KRASNOV
228 Park Avenue South
PMB 85451
New York, New York 10003
Telephone:  (202) 509-1621
robert.lynch@buzko.legal

*Attorneys for Plaintiff, Ex-Human Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **Ex-Human Inc.,** | **Case No. 3:26-cv-02798-JD** |
| **Plaintiff,** | **PLAINTIFF'S NOTICE OF MOTION AND RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| **v.** | |
| **Apple Inc.,** | |
| **Defendant.** | |
| | **Date:** |
| | **Time:** |
| | **Place: Courtroom 11, 19th Floor** |
| | **Judge: Hon. James Donato** |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on _____, 2026, or as soon thereafter as the matter may be heard, Plaintiff Ex-Human Inc. ("Ex-Human") will and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-1, for a Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue requiring Defendant Apple Inc. and its officers, employees, agents, and all persons acting in concert with them (collectively, "Apple") to reinstate Ex-Human's Apple Developer Program membership and developer account, restore Ex-Human's iOS applications to the App Store, and to cease withholding earnings associated with Ex-Human's developer account, pending further order of this Court.

This motion is based on Apple's termination of Ex-Human's developer account on March 13, 2026, after invoking misconduct-based provisions of the Apple Developer Program License Agreement, including Section 3.2(f), while failing to identify the conduct it contends justified that determination, and its continued enforcement of that termination on the same basis.

This motion is made on the grounds that: (1) absent immediate relief, Ex-Human will suffer irreparable harm from continued exclusion from the iOS platform; (2) Ex-Human is likely to succeed on the merits or at minimum raises serious questions as to whether Apple may continue to enforce termination on a misconduct-based rationale without identifying the conduct it contends violated the parties' agreement; (3) the balance of equities tips sharply in Ex-Human's favor because Apple has identified no concrete harm that would result from temporary reinstatement; and (4) the public interest supports interim relief.

This motion is based upon the Complaint in this action (Dkt. 1), this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Artem Rodichev, the proposed Temporary Restraining Order and Order to Show Cause, all matters subject to judicial notice, and such further evidence as may be presented.

**NOTICE OF MOTION AND MOTION FOR TRO AND ORDER TO SHOW CAUSE**

## **Table of Contents**

Table of Authorities ......................................................................................................................... iv

Introduction ..................................................................................................................................... 1

Factual Background ......................................................................................................................... 1

    A.    Apple's App Store and Developer Program ...................................................... 1

    B.    Ex-Human and Its Applications ........................................................................ 2

    C.    Apple's Misconduct Allegations and Termination Without Identified Conduct ........... 2

    D.    Apple's Withholding of Earned Proceeds Without Accounting .................................... 4

    E.    Ongoing Harm from Exclusion from the iOS Platform ................................................ 4

Argument ......................................................................................................................................... 6

    I.    Ex-Human is Suffering Immediate and Irreparable Harm Absent Interim Relief .......... 6

    II.    Interim Relief Preserves the Status Quo and the Balance of Equities Favors Relief ..... 9

    III.    Ex-Human is Likely to Succeed, or at Minimum Raises Serious Questions, Because Apple Continues to Enforce Termination Based on Unidentified Misconduct ............ 10

        A.  Apple Invoked Misconduct-Based Provisions Without Identifying the Conduct It Contends Violated Them ........................................................................ 10

        B.  That Conduct Likely Breaches the Implied Covenant of Good Faith and Fair Dealing ...................................................................................................................... 10

        C.  Apple's Conduct Likely Violates California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ........................................................................ 12

        D.  Apple's Withholding of Earned Proceeds Without Identified Basis Further Supports Serious Questions on the Merits ........................................................ 13

    IV.    The Public Interest Supports Interim Relief ................................................................. 14

    V.    Conclusion ..................................................................................................................... 14

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Table of Authorities**

Cases

*14859 Moorpark Homeowner's Ass'n v. VRT Corp.*,
  63 Cal. App. 4th 1396 (1998) ................................................................................................... 9

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................................................. 6

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ................................................................................................. 7

*Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*,
  2 Cal. 4th 342 (1992) ....................................................................................................... 11, 12

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .............................................................................................. 7

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946, 1000 (9th Cir. 2023) ....................................................................................... 12

*Free Range Content, Inc. v. Google Inc.*,
  No. 14-CV-02329-BLF, 2016 WL 2902332 (N.D. Cal. May 13, 2016) .................................. 13

*Guz v. Bechtel Nat. Inc.*,
  24 Cal. 4th 317, 349, 8 P.3d 1089 (2000) ............................................................................. 10

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  273 F. Supp. 3d 1099 (N.D. Cal. 2017) ........................................................................ 8, 9, 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ................................................................................................. 8

*In re Bank of America California Unemployment Benefits Litig.*,
  674 F. Supp. 3d 884 (S.D. Cal. 2023) ................................................................................... 11

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ................................................................................................... 7

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ................................................................................................... 6

*Where Do We Go Berkeley v. California Dep't of Transp.*,
  32 F.4th 852 (9th Cir. 2022) ................................................................................................. 10

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008) ..................................................... 6

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Ex-Human seeks a temporary restraining order restoring its Apple Developer Program account and reinstating its iOS applications. Apple terminated Ex-Human's account after accusing it of "dishonest or fraudulent activity" under Section 3.2(f), but never identified the conduct that supposedly justified that determination. Across multiple notices and appeals, Apple relied on generalized, boilerplate descriptions of possible misconduct while continuing to enforce complete exclusion from the iOS platform.

That ongoing exclusion is causing immediate and irreparable harm. Ex-Human has lost access to its iOS user base, its subscription relationships have been disrupted, and its position in a fast-moving consumer market is deteriorating in ways that cannot be fully repaired through damages. Because the App Store is the only authorized distribution channel for native iOS applications, Ex-Human cannot reach those users through any alternative channel.

Ex-Human is likely to succeed on the merits because Apple continues to enforce termination on a misconduct-based rationale while refusing to identify the conduct it contends triggered that determination. At minimum, this raises serious questions under the implied covenant of good faith and fair dealing. Interim relief would preserve the status quo that existed before Apple's January 24, 2026 actions, and Apple has identified no concrete risk that would result from temporary reinstatement pending adjudication on the merits.

**FACTUAL BACKGROUND**

**A.      Apple's App Store and Developer Program**

Apple operates the App Store as the only authorized distribution channel for native iOS applications on iPhone in the United States. Complaint ("Compl.") ¶¶ 20, 66. Developers must participate in Apple's Developer Program and comply with the Apple Developer Program License Agreement ("DPLA") to distribute applications to iOS users. *Id.* at ¶¶ 20-22.

Under that framework, Apple controls both initial access to the App Store and the continued availability of applications through its review and enforcement processes. *Id.* at ¶¶ 20, 22-23. Apple also processes in-app purchases and subscriptions through its payment system and collects and remits developer proceeds pursuant to Schedule 2 of the DPLA. *Id.* at ¶¶ 24, 60, 62.

**1**
**MEMORANDUM OF POINTS AND AUTHORITIES**

Section 3.2(f) of the DPLA prohibits "dishonest or fraudulent activity" in connection with a developer's applications. Compl. ¶ 42. Apple invoked that provision as the basis for the actions at issue here. *Id.*

### B.    Ex-Human and Its Applications

Ex-Human develops consumer-facing artificial intelligence applications, including Botify AI ("Botify") and Photify AI ("Photify"). *Id.* at ¶ 31. Over the past five years, Ex-Human has built its technology, products, and user base through more than $10 million in investment, including $4 million in venture capital funding. Declaration of Artem Rodichev ("Rodichev Decl.") ¶ 2.

Botify, launched in 2021, had remained continuously available on the App Store for nearly four years, accumulated more than 2.3 million iOS installs, and generated approximately $330,000 in monthly revenue prior to its removal. Compl. ¶ 34. Photify, launched in 2024, generated approximately $100,000 in monthly revenue before it was removed from the App Store. *Id.* at ¶ 35.

Ex-Human's ability to distribute these applications, maintain subscription-based relationships with users, and operate its iOS business depends on continued access to its Apple Developer Program account and the App Store. *Id.* at ¶ 32.

### C.    Apple's Misconduct Allegations and Termination Without Identified Conduct

On January 24, 2026, Apple issued a "Pending Termination Notice" asserting that Ex-Human's developer account had been used for "dishonest or fraudulent activity" under Section 3.2(f) of the DPLA. *Id.* at ¶ 42. Apple simultaneously removed Photify from the App Store and froze all earnings payments. *Id.* Ex-Human did not understand why it received that notice. Ex-Human had not engaged in dishonest or fraudulent activity, and its repeated efforts in the weeks that followed to obtain clarification from Apple yielded no meaningful explanation. Rodichev Decl. ¶ 14.

Apple's notice did not identify any specific submission, transaction, content item, or other act that purportedly violated Section 3.2(f). Compl. ¶¶ 42-43. It referred generally to prior guideline violations but did not identify the correspondence or conduct at issue. *Id.* at ¶ 43. Ex-Human promptly submitted an appeal providing detailed information about its applications, including their

**2**
**MEMORANDUM OF POINTS AND AUTHORITIES**

technical architecture and content-moderation systems, and offering to implement any additional safeguards Apple required. *Id.* at ¶ 44.

On February 10, 2026, Apple denied the appeal, stating that it had identified a "pattern of manipulative or misleading behavior" and listing categories of possible violations, including inaccurate metadata, misleading content, and ratings manipulation. *Id.* at ¶ 45. Apple did not state which, if any, of those categories it attributed to Ex-Human and did not identify any specific submission, transaction, or act. Compl. ¶ 45.

Ex-Human submitted a reinstatement petition on February 11, 2026, and additional appeals thereafter, repeatedly attempting to address Apple's concerns and offering to implement further safeguards. *Id.* at ¶ 46.

Apple denied each appeal using substantially similar language. *Id.* at ¶¶ 45, 47-48, 50. It continued to cite Section 3.2(f) and later referenced App Review Guidelines 1.1, 1.1.4, and 5.6, but again did not identify any specific submission, transaction, content item, or act underlying its determination. *Id.* Throughout this process, Ex-Human attempted to engage directly with Apple's App Review team, including through multiple requests for calls. *Id.* at ¶¶ 44, 46, 49, 52-53; Rodichev Decl. ¶¶ 24-25. Those requests were denied. Rodichev Decl. ¶ 25. Following termination of Ex-Human's developer account, Ex-Human lost access to App Store Connect and the related systems through which it had submitted appeals, petitions, and communicated with Apple's App Review and Business Management teams, leaving it with no remaining channel to communicate with Apple. *Id.* at ¶ 30.

On March 13, 2026, Apple formally terminated Ex-Human's developer account. Compl. ¶ 54. The termination notice again asserted "fraudulent conduct" but did not identify any specific factual basis for that determination. *Id.* As a result, Botify was removed from the App Store, iOS payment processing ceased, and Ex-Human lost access to its iOS user base. *Id.* Across all communications, Apple repeatedly accused Ex-Human of serious misconduct but did not identify the conduct it contends violated Section 3.2(f) or the cited guidelines, while continuing to enforce termination and exclusion from the platform. *Id.* at ¶¶ 45, 47-48, 50, 54.

**3**
**MEMORANDUM OF POINTS AND AUTHORITIES**

### D.    Apple's Withholding of Earned Proceeds Without Accounting

Apple paused all earnings payments to Ex-Human effective January 24, 2026 and has withheld approximately $506,000 in developer proceeds generated from completed App Store transactions. Rodichev Decl. ¶ 31. Those funds were collected by Apple through its in-app payment system in its role as Ex-Human's agent for processing end-user transactions. Compl. ¶ 56. Apple has access to transaction-level data sufficient to identify refunds, chargebacks, or other adjustments. Compl. ¶ 57.

Apple has not identified any specific transaction that it contends is fraudulent, invalid, or subject to chargeback. *Id.* at ¶ 57. It has not provided any accounting of the withheld funds or identified any portion of those funds as tied to refunds or other offsets. *Id.* at ¶ 58. Based on Ex-Human's historical data, refund rates for its applications are low and would account for only a small fraction of the approximately $506,000 withheld. Rodichev Decl. ¶ 35. Apple has not represented that the withheld funds have been applied to any identified refund obligation or other transaction-specific basis. Compl. ¶ 61.

### E.    Ongoing Harm from Exclusion from the iOS Platform

Apple's termination of Ex-Human's developer account has eliminated Ex-Human's ability to distribute its applications to iOS users through the App Store, the only authorized distribution channel for native iOS applications in the United States. *Id.* at ¶¶ 63, 66. As a result, Ex-Human has lost access to its iOS user base, disrupted ongoing subscription relationships, and eliminated its primary iOS revenue streams. *Id.* at ¶ 64; Rodichev Decl. ¶ 37-40. Users have contacted Ex-Human regarding the unavailability of its applications and the inability to continue using or purchasing services through iOS. Rodichev Decl. ¶ 39.

The financial consequences are immediate and severe. Before Apple terminated Ex-Human's developer account, ███████████████████████████████████████████ ███████████████████████████████████ Rodichev Decl. ¶ 40. Following Apple's removal of Photify, App Store revenue declined to ████████████████████████████████ ██████████████████████████████████████████████ after Botify was removed. *Id.*

**4**
**MEMORANDUM OF POINTS AND AUTHORITIES**

Apple's actions have also caused spillover harm to Ex-Human's Google Play revenue. As reflected in Ex-Human's platform revenue data (Rodichev Decl., Exhibit G), Google Play revenue declined from ███████████████████████████████████████████ ███████████████████████████████████ *Id.* at ¶ 41. This decline resulted from Apple's actions, which forced Ex-Human to reduce marketing and user-acquisition spending across all platforms, thereby decreasing Android user acquisition and Google Play revenue. Rodichev Decl. ¶ 42.

Ex-Human is in severe financial distress. As of April 21, 2026, Ex-Human had ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████ Id. at ¶ 44. Ex-Human's monthly operating expenses total ███████████████████████████ ██████████████████████████████ *Id.* at ¶ 45. Ex-Human has already laid off three employees and, absent restoration of iOS revenue and release of the withheld Apple funds, will likely need to reduce at least half of its remaining workforce within the next 30 days. *Id.* at ¶ 46. If that occurs, Ex-Human will be forced to suspend most product development and operate only at a minimum maintenance level, placing the company on a path toward total shutdown. *Id.*

Apple's conduct has taken Ex-Human's iOS business offline. Ex-Human can no longer distribute its applications through the App Store, acquire new iOS users, process in-app purchases, or operate its subscription business in the manner on which it was built. *Id.* at ¶ 47. The existing web version is not a viable substitute. *Id.* at ¶¶ 48-49. It has historically generated significantly less revenue and does not provide comparable discovery, distribution, subscription continuity, retention, or overall revenue performance, and existing iOS subscribers cannot readily be migrated to web billing. *Id.*

Each day that Ex-Human remains excluded from the App Store further disrupts user relationships, increases attrition, and diminishes the likelihood that those users will return even if access is later restored. Compl. ¶ 66. In consumer software markets, lost momentum and user

engagement are difficult or impossible to recreate after the fact. Rodichev Decl. ¶ 51. Before Apple's January 24, 2026 actions, Ex-Human maintained an active developer account, Botify had remained continuously available on the App Store for years, and Ex-Human was serving its iOS users through Apple's platform. Compl. ¶¶ 2, 55. Interim relief would restore that pre-termination state while this dispute is adjudicated on the merits.

## ARGUMENT

A temporary restraining order should issue because Ex-Human is suffering immediate and irreparable harm, is likely to succeed on the merits or at least raises serious questions going to the merits, the balance of equities tips sharply in its favor, and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). Under the Ninth Circuit's sliding-scale approach, a strong showing on irreparable harm and the balance of equities supports relief where serious questions exist on the merits. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## I.   EX-HUMAN IS SUFFERING IMMEDIATE AND IRREPARABLE HARM ABSENT INTERIM RELIEF

Apple's termination of Ex-Human's developer account has already caused, and continues to cause, irreparable harm. Ex-Human has been excluded from the iOS platform, lost access to its iOS user base, and experienced disruption to ongoing subscription relationships and user engagement that cannot be fully remedied through monetary damages. Compl. ¶¶ 64, 66. This is not a case involving temporary lost revenue; it is a case involving ongoing exclusion from the only channel through which Ex-Human can reach iOS users.

***Loss of Access to the Only iOS Distribution Channel.*** The App Store is the only authorized distribution channel for native iOS applications in the United States. *Id.* at ¶ 66. Without access to its developer account, Ex-Human cannot distribute its applications to iOS users, maintain existing user relationships through that channel, or restore its position in the iOS ecosystem. *Id.* Such "[e]vidence of threatened loss of prospective customers and goodwill certainly supports a finding of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

**6**
**MEMORANDUM OF POINTS AND AUTHORITIES**

***Disruption of User Relationships and Subscription Continuity.*** Ex-Human built its iOS user base over nearly four years, including more than 2.3 million installs of Botify. Compl. ¶ 34. Following Apple's actions, Ex-Human has lost the ability to serve those users through iOS, acquire new iOS users, or continue subscription billing through the App Store. Rodichev Decl. ¶ 38. Users have already contacted Ex-Human regarding the unavailability of its applications and the inability to continue using or purchasing services. Rodichev Decl. ¶ 39.

***Compounding Loss of Goodwill and Market Position.*** Each day that Ex-Human remains excluded from the App Store further disrupts user relationships, increases attrition, and diminishes the likelihood that users will return even if access is later restored. Rodichev Decl. ¶ 51. In consumer software markets, lost user engagement and momentum are difficult or impossible to recreate after the fact. These harms are not readily quantifiable and cannot be fully remedied through damages. *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm").

***Loss of Ability to Compete in the iOS Ecosystem.*** Apple's actions have eliminated Ex-Human's ability to compete within the iOS ecosystem. The removal of Photify and Botify from the App Store prevents Ex-Human from reaching iOS users entirely. Compl. ¶ 66. The threat of being driven out of a market supports a finding of irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("[t]he threat of being driven out of business is sufficient to establish irreparable harm"); *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("mere damages will not compensate for a competitor's increasing share of the market").

***Imminent Shutdown.*** Apple's conduct is causing immediate and existential harm to Ex-Human's business. Before Apple's actions, iOS was Ex-Human's primary revenue channel, accounting for ███████████████████████████. Rodichev Decl. ¶ 40. After Apple removed Photify and then terminated Ex-Human's developer account, App Store revenue fell sharply and had effectively collapsed by April 20, 2026. *Id.* Apple's actions also caused a measurable decline in Google Play revenue by forcing Ex-Human to reduce marketing

**7**
**MEMORANDUM OF POINTS AND AUTHORITIES**

and user-acquisition spending across the business. *Id.* at ¶¶ 41-42. Ex-Human is now in severe financial distress, with ██████████████████████████████████████████. ██████████████ *Id.* at ¶ 44. Ex-Human has already laid off employees and, absent restoration of iOS revenue and release of withheld funds, will likely need to reduce at least half of its remaining workforce within the next 30 days. *Id.* at ¶ 46. If that occurs, Ex-Human will be forced to suspend most product development and operate only at a minimum maintenance level, placing the company on a path toward shutdown. *Id.* These harms—including loss of employees, operational capacity, and the ability to continue as a going concern—are irreparable because they cannot be fully remedied after the fact. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1105-06 (N.D. Cal. 2017).

*No Adequate Substitute for Lost App Store Distribution.* Ex-Human's existing web version does not mitigate the irreparable harm caused by Apple's actions. Rodichev Decl. ¶¶ 48-49. The web version has historically generated significantly less revenue and does not restore App Store discovery, native iOS distribution, subscription continuity, retention, or overall revenue performance. *Id.* Existing iOS subscribers also cannot readily be migrated from Apple's billing system to web billing. *Id.* Nor can Ex-Human offset these losses through other platforms: as demonstrated in the record, Apple's actions have also caused a decline in Google Play revenue by forcing Ex-Human to reduce marketing and user-acquisition efforts across the business. *Id.* at ¶¶ 41-42. Web and Android channels therefore do not provide an adequate substitute for the lost iOS business and do not mitigate the irreparable harm resulting from Apple's conduct.

*No Adequate Remedy at Law.* Courts have recognized that exclusion from a platform on which a business depends, where no viable alternative exists, constitutes irreparable harm. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1189 (9th Cir. 2022) (affirming preliminary injunction where plaintiff's business relied on access to LinkedIn profiles and there was "no current viable alternative"). That is the situation here. Without interim relief, Ex-Human remains entirely excluded from the iOS platform, and the resulting harm to its business, user relationships, goodwill will continue to compound. Compl. ¶ 66.

**8**
**MEMORANDUM OF POINTS AND AUTHORITIES**

## II.    INTERIM RELIEF PRESERVES THE STATUS QUO AND THE BALANCE OF EQUITIES FAVORS RELIEF

Apple, by contrast, will suffer no cognizable harm from restoration of the status quo. The status quo is defined as "the last actual peaceable, uncontested status which preceded the pending controversy." *14859 Moorpark Homeowner's Ass'n v. VRT Corp.*, 63 Cal. App. 4th 1396, 1408 (1998). The relief sought here would return the parties to the pre-January 24, 2026 state, when Ex-Human maintained an active developer account, its applications remained available on the App Store, and it was able to serve its iOS user base.

Reinstatement would preserve that status quo and halt the ongoing disruption to Ex-Human's iOS business pending adjudication on the merits. Without interim relief, Ex-Human remains excluded from the only channel through which it can reach iOS users, and the resulting harm continues to compound. Compl. ¶ 66.

Apple has identified no specific harm—financial, operational, or otherwise—that would result from temporarily restoring Ex-Human's developer account. *Id.* at ¶¶ 45, 47-48, 50, 54. In its termination communications, Apple repeatedly invoked generalized allegations of misconduct but did not identify any specific conduct or resulting risk associated with Ex-Human's continued participation in the Developer Program. *Id.* Where a platform operator has permitted a business to operate for years without identifying concrete harm, courts have found no cognizable injury from temporary continued access pending adjudication. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1107 (N.D. Cal. 2017).

By contrast, absent reinstatement, Ex-Human faces ongoing and irreparable harm from its exclusion from the iOS platform, including disruption of user relationships, loss of goodwill, loss of its primary revenue channel, and a decline in revenue across other platforms caused by forced reductions in marketing and user acquisition. Apple's continued withholding of approximately $506,000 in earned proceeds further exacerbates Ex-Human's liquidity crisis, leading to imminent financial harm, additional layoffs, and a likely operational shutdown. Rodichev Decl. ¶¶ 31, 40-46, 56. The balance of equities therefore strongly favors interim relief. Compl. ¶ 66.

### III. EX-HUMAN IS LIKELY TO SUCCEED, OR AT MINIMUM RAISES SERIOUS QUESTIONS, BECAUSE APPLE CONTINUES TO ENFORCE TERMINATION BASED ON UNIDENTIFIED MISCONDUCT

"[W]hen plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits." *Where Do We Go Berkeley v. California Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). As demonstrated above, Ex-Human has established the first three factors. At a minimum, Ex-Human raises serious questions going to the merits of whether Apple may continue to enforce termination and withhold revenue on a misconduct-based rationale without identifying the conduct it contends violated the DPLA.

### A. Apple Invoked Misconduct-Based Provisions Without Identifying the Conduct It Contends Violated Them

Apple invoked Section 3.2(f) of the DPLA and related App Review Guidelines as the basis for removing Ex-Human's applications and terminating its developer account. Compl. ¶¶ 42, 45, 47-48, 50, 54. Across multiple notices and appeal responses, Apple repeatedly asserted "dishonest or fraudulent activity" and other forms of misconduct. *Id.*

At no point, however, did Apple identify any specific submission, transaction, content item, or other act that it contends violated those provisions. *Id.* Nor did Apple identify any specific instance of the alleged misconduct despite having full visibility into Ex-Human's applications and transaction data. *Id.* at ¶ 57. Instead, Apple relied on generalized descriptions of possible violations while continuing to impose the most severe consequence available to it—complete exclusion from the iOS platform. *Id.* at ¶¶ 45, 47-48, 50, 54. Apple's continued enforcement of termination on that basis—without identifying the conduct it contends triggered Section 3.2(f)—raises serious questions as to whether it is acting within the bounds of its contractual discretion.

### B. That Conduct Likely Breaches the Implied Covenant of Good Faith and Fair Dealing

California law implies a covenant of good faith and fair dealing in every contract. *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349, 8 P.3d 1089, 1110 (2000). The covenant prevents a party from exercising contractual discretion in a manner that unfairly frustrates the agreed purposes of

the contract or deprives the other party of its benefits. *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992). Apple exercised its discretion to terminate Ex-Human's developer account and remove its applications based on alleged misconduct, while refusing to identify the conduct underlying that determination. Compl. ¶¶ 45, 47-48, 50, 54. Throughout its communications, Apple asserted "dishonest or fraudulent activity" but did not identify any specific submission, transaction, content item, or act supporting that conclusion. *Id.*

That absence of specificity is particularly significant given Apple's access to comprehensive application and transaction data. Apple possessed full visibility into Ex-Human's applications and operations, yet identified no concrete instance of the misconduct it cited. Compl. ¶¶ 45, 47-48, 50, 54, 57. A decision to impose the most severe consequence available—termination and complete exclusion from the platform—without identifying any specific underlying conduct raises serious questions as to whether Apple engaged in an individualized, good-faith determination. *See In re Bank of America California Unemployment Benefits Litig.*, 674 F. Supp. 3d 884, 901 (S.D. Cal. 2023).

Ex-Human repeatedly attempted to engage with Apple, provide information about its applications, and implement any safeguards. *Id.* at ¶¶ 44, 46, 49, 52-53. Apple nevertheless continued to rely on generalized allegations while enforcing termination. At a minimum, this course of conduct raises serious questions as to whether Apple exercised its contractual discretion consistent with the implied covenant.

Ex-Human also alleges facts supporting an inference that Apple's actions were not the result of a neutral, individualized determination. Apple removed Photify, an application with functionality overlapping Apple's own Image Playground, while continuing to assert generalized misconduct without identifying specific conduct. *Id.* at ¶¶ 10-13, 45, 47-48, 50, 54, 57. These facts further support the conclusion that Apple's exercise of discretion raises serious questions under the implied covenant.

Apple's withholding of earned revenue without identifying any transaction-level basis further supports that inference. Apple has not identified any specific fraudulent transaction, refund obligation, or other concrete basis for withholding approximately $500,000 in earned proceeds. *Id.*

**11**
**MEMORANDUM OF POINTS AND AUTHORITIES**

at ¶ 57. The continued withholding of earned revenue without identified basis raises additional questions as to whether Apple's conduct was consistent with its contractual obligations.

**C.    Apple's Conduct Likely Violates California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**

California's Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. At a minimum, Ex-Human raises serious questions going to the merits of its UCL claim because Apple's conduct, as alleged, is unfair within the meaning of Section 17200. The same course of conduct that supports Ex-Human's contract-based claims also supports equitable relief under the UCL.

Apple repeatedly asserted that Ex-Human engaged in "dishonest or fraudulent activity" and later cited App Review Guidelines 1.1, 1.1.4, and 5.6, yet it did not identify any specific submission, transaction, content item, or other act that it contends violated those provisions. Compl. ¶¶ 42-54. Apple nevertheless continued to enforce Ex-Human's exclusion from the App Store and to withhold approximately $500,000 in earned developer proceeds without identifying any specific refund obligation, chargeback, or transaction-level basis for doing so. Compl. ¶¶ 55-61. On these allegations, Ex-Human has at minimum raised serious questions as to whether Apple's exercise of its gatekeeper authority—terminating a developer, excluding its applications, and withholding substantial earned proceeds while refusing to identify any underlying conduct or transaction-level basis—constitutes an unfair business practice within the meaning of the UCL. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-01 (9th Cir. 2023) (reasoning that "[t]he unfair prong is intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive") (internal quotation marks omitted).

Apple controls the only authorized distribution channel for native iOS applications in the United States. *Id.* at ¶ 66. At the same time, Apple offers its own competing AI image-generation application, Image Playground, which Ex-Human alleges overlaps substantially with Photify in core functionality and user flow. *Id.* at ¶¶ 36–40. Apple removed Photify from the App Store while continuing to offer Image Playground on the same platform, all while refusing to identify the

**12**
**MEMORANDUM OF POINTS AND AUTHORITIES**

specific conduct it contends justified its misconduct determination. *Id.* In those circumstances, Ex-Human has at minimum raised serious questions whether Apple's opaque exercise of platform power to exclude a competing application and withhold earned proceeds is unfair within the meaning of Section 17200. *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1117-18 (N.D. Cal. 2017) (finding serious questions on UCL unfairness claim where platform operator plausibly used its control over essential data access to cut off a rival while developing a competing product and thereby leveraged dominance to gain a competitive advantage).

Apple's conduct has caused Ex-Human to lose money and property in the form of withheld developer proceeds, lost App Store distribution, lost user relationships, lost goodwill, and lost revenue associated with the removal of Botify and Photify from the App Store. Compl. ¶¶ 55-66, 110-117. Those allegations are sufficient to support UCL standing and further support interim equitable relief pending adjudication on the merits.

### D.    Apple's Withholding of Earned Proceeds Without Identified Basis Further Supports Serious Questions on the Merits

Ex-Human's breach of contract claim regarding withheld revenue is straightforward. Schedule 2, Section 7.1 of the DPLA permits Apple to withhold developer earnings in limited circumstances, including to account for refunds or where Apple determines or suspects misconduct. *Id.* at ¶ 27. Apple has not identified any specific transaction subject to a refund obligation. *Id.* at ¶ 57. It has not articulated any transaction-level basis for its suspicion of misconduct. It has provided no accounting of how the withheld funds are being held or applied. *Id.* at ¶ 58. Apple continues to withhold approximately $500,000 in earned developer proceeds from completed transactions without identifying any refund basis, suspected misconduct, or other specific contractual justification. *Id.* at ¶¶ 55-58.

Even where contractual language grants discretion, that discretion must be exercised in a manner consistent with the contract. In *Free Range Content, Inc. v. Google Inc.*, No. 14-CV-02329-BLF, 2016 WL 2902332 (N.D. Cal. May 13, 2016), the court held that Google could not rely on broad discretionary language to justify withholding payments without actually exercising that discretion in a grounded and specific manner. Apple's position here is weaker: it has not identified

**13**
**MEMORANDUM OF POINTS AND AUTHORITIES**

any transaction, refund, or specific basis for withholding the funds at issue. This conduct independently raises serious questions on the merits.

## IV.    THE PUBLIC INTEREST SUPPORTS INTERIM RELIEF

The public interest favors interim relief. Botify served a substantial iOS user base before its removal, and Apple's termination of Ex-Human's developer account has disrupted access for users who relied on Ex-Human's applications through the App Store. Compl. ¶ 54. Preserving access to an operating consumer service pending adjudication serves the public interest, particularly where the platform operator has not identified the specific conduct it contends justified termination. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (public interest favored preliminary relief preserving continued access to a publicly available platform pending adjudication).

The public interest also favors fair and transparent enforcement of platform rules. Ex-Human does not seek to prevent Apple from enforcing its agreements or policies. It seeks only interim relief where Apple invoked misconduct-based provisions, terminated Ex-Human's account, and continues to enforce that termination without identifying the conduct it contends violated those provisions. Temporary reinstatement pending further proceedings therefore serves the public interest by preserving user access and ensuring that serious misconduct allegations are enforced in a manner consistent with the parties' agreements.

## V.    CONCLUSION

For the foregoing reasons, Ex-Human respectfully requests that the Court enter a temporary restraining order restoring Ex-Human's Apple Developer Program membership and reinstating its applications to the App Store pending further proceedings. Apple invoked misconduct-based provisions to terminate Ex-Human's account, yet never identified the conduct it contends justified that determination, while Ex-Human continues to suffer immediate and irreparable harm from exclusion from the iOS platform. That harm includes the loss of Ex-Human's primary revenue channel, the continued withholding of approximately $506,000 in earned proceeds, and resulting severe financial distress, including imminent further layoffs and a likely operational shutdown absent relief. Interim relief is necessary to preserve the status quo and prevent that harm from

**14**
**MEMORANDUM OF POINTS AND AUTHORITIES**

compounding pending adjudication on the merits.

Dated: April 22, 2026

Respectfully submitted,

LAW OFFICES OF DAVID A. MAKMAN

By: *David Makman*
David Makman, SBN 178195

*Counsel for Plaintiff*
*Ex-Human Inc.*

**MEMORANDUM OF POINTS AND AUTHORITIES**